DEANNE M. MILLER, Plaintiff-Appellant, v. THE HIGHWAY COMMISSIONER OF NORTH OTTER TOWNSHIP ROAD DISTRICT *et al.*, Defendants (Rural Electric Convenience Cooperative Company, Defendant-Appellee).

Fourth District    No. 4—03—0347

Opinion filed December 18, 2003.

COOK, J., specially concurring.

Bruce A. Beeman (argued), of Wolter, Beeman & Lynch, of Springfield, for appellant.

John E. Nolan (argued), of Hinshaw & Culbertson, of Springfield, for appellee.

JUSTICE STEIGMANN, delivered the opinion of the court:

In July 1999, plaintiff, Deanne M. Miller, sued defendants, the Highway Commissioner of North Otter Township Road District, North Otter Township Road District, North Otter Township, and Rural Electric Convenience Cooperative Company (Rural Electric), for injuries Miller sustained when her minivan skidded off a roadway and struck a utility pole owned by Rural Electric.

In October 2002, Rural Electric filed a motion, pursuant to section 2—619 of the Code of Civil Procedure (Code) (735 ILCS 5/2—619 (West 2002)), to dismiss count IV of Miller's complaint, which alleged, in pertinent part, that Rural Electric had negligently placed the utility pole. Following a February 2003 hearing, the trial court granted the motion to dismiss, upon determining that Rural Electric owed Miller no duty of care. In March 2003, the court entered a finding that no just reason existed for delaying enforcement or appeal of its order (155 Ill. 2d R. 304(a)).

Miller appeals the trial court's granting of Rural Electric's October 2002 motion to dismiss count IV, and we affirm.

## I. BACKGROUND

Around 10:20 p.m. on July 18, 1998, Miller was driving her mini-

van east on Hays Road in Macoupin County. (The township maintained that portion of Hays Road by spreading oil and then placing gravel on it.) As Miller approached the unmarked and unlighted intersection of Hays Road and Jones Road, she thought that Hays Road either ended or veered sharply to the right. As she attempted to negotiate the right-hand turn onto Jones Road, her minivan skidded through the intersection and struck Rural Electric's utility pole, which was located approximately 10 feet from the southeast corner of the intersection. As a result of the collision, Miller sustained serious injuries, including the loss of one eye.

In July 1999, Miller filed a complaint against Rural Electric and the other defendants. Count IV of the complaint alleged, in pertinent part, that Rural Electric acted negligently by (1) placing the utility pole "in a location closely behind and slightly to the right" of the intersection of Hays and Jones Roads, and (2) failing to (a) warn motorists about the utility pole, (b) place lighting or reflective tape on the utility pole, and (c) provide a cushion barrier or a "breakaway" utility pole.

In August 1999, Rural Electric filed a motion, pursuant to section 2—615 of the Code (735 ILCS 5/2—615 (West 1998)), to dismiss count IV of Miller's complaint, alleging that the complaint failed to state a cause of action because it failed to allege that Rural Electric owed Miller a duty. Following a September 1999 hearing on Rural Electric's motion, the trial court dismissed count IV's allegations that Rural Electric acted negligently by failing to (1) warn motorists about the utility pole, (2) place lighting or reflective tape on the utility pole, and (3) provide a cushion barrier or a "breakaway" utility pole. As to the remaining allegation set forth in count IV, the court requested that Rural Electric resubmit its motion to dismiss after the parties completed discovery.

In October 2002, Rural Electric filed a motion, pursuant to section 2—619 of the Code (735 ILCS 5/2—619 (West 2002)), to dismiss the remaining allegation set forth in count IV of Miller's complaint—namely, that Rural Electric had negligently placed the utility pole "in a location closely behind and slightly to the right" of the intersection of Hays and Jones Roads. In the motion, Rural Electric argued that it owed no duty to Miller because (1) "the utility pole was off the traveled surface of the roadway"; and (2) Miller "was not in the ordinary course of travel as she deviated from the road and struck the utility pole." Rural Electric also filed a memorandum of law in support of its motion to dismiss. Attached to the memorandum were the following: (1) the discovery depositions of Sharon Hays and Dara Drake, both of whom lived on Hays Road at the time of the accident; and (2) the af-

fidavit of Louis DeLaby, Rural Electric's manager of operations and maintenance.

In January 2003, Miller filed a response to Rural Electric's motion to dismiss. Attached to the response were the following: (1) nine photographs of the accident site and the nearby roadway, which were taken shortly after the accident (Miller's exhibit Nos. 1 through 9); (2) DeLaby's discovery deposition; and (3) Miller's discovery deposition.

Because the parties are familiar with the facts set forth in the depositions and affidavit, we discuss them only to the extent necessary to put Miller's argument in context. Hays testified that since 1977, she had lived on Hays Road about a half-mile from the intersection of Hays and Jones Roads. Hays identified Miller's exhibit Nos. 1 through 9 as photographs accurately depicting Hays Road and its intersection with Jones Road at the time of the accident. As a driver approaches the intersection, there are a series of rises and dips, and the crossroads are difficult to see "until you get up there." If a driver is not familiar with Hays Road, she would think that it is a "regular road" east of the intersection. However, east of the intersection Hays Road is "mostly dirt," although it is maintained by North Otter Township. The intersection "pretty much always" contains loose gravel on top of the oiled surface. On occasions when Hays drove 40 to 45 miles per hour as she turned from Hays Road south onto Jones Road, her car "sort of" lost traction on the loose gravel. However, her car did not slide or swerve. Hays was not personally aware of any prior accidents at the intersection involving the utility pole. She had heard of a "couple" of accidents on Hays Road, including a fender bender, a car hitting a roadway mile marker, and drunk drivers sliding into ditches. Hays had never contacted Rural Electric about its placement of the utility pole.

Dara Drake testified that she had lived on Hays Road near its intersection with Jones Road for five years. Around 10:20 p.m. on July 18, 1998, Drake was in her house when she and her husband heard a crash. After dialing 9-1-1, she joined her husband at the accident site and saw that the front driver's side of Miller's minivan had struck the utility pole. Drake stated that Hays Road continues on east of the intersection, although it becomes a dirt road. A driver traveling east on Hays Road may go through the intersection and then either continue straight on the dirt road or turn left into the Drakes' driveway. Drake knew of other people who commonly used that section of Hays Road "as a means of travel." Drake was aware of other accidents in which drivers drove into the Drakes' field on the northwest side of the intersection (diagonally across the intersection from the utility pole). She did not know whether those drivers lost

control in the intersection or simply drove off the road into the field. Drake never contacted Rural Electric regarding any accidents, and she was not aware of any accidents (other than Miller's) that had occurred at the intersection involving the utility pole. Drake previously had telephoned the township road commissioner and requested that the township install stop signs at the intersection because drivers go too fast as they approach it. If drivers traveled at a "reasonable speed," the loose gravel at the intersection was not dangerous.

DeLaby averred that he had been employed by Rural Electric since 1972 and was familiar with the location of the utility pole near the intersection of Hays and Jones Roads. Prior to placing the utility pole at its current location, Rural Electric was not "aware of any dangerous propensity of the intersection" and did not know of any accidents in which vehicles left the roadway because of a failed right-hand turn onto Jones Road while traveling east on Hays Road. In addition, Rural Electric was not aware of any accident (other than Miller's) in which a vehicle left the roadway at the intersection and struck the utility pole. Rural Electric had never received any complaints from residents regarding the safety of the utility pole's location.

DeLaby testified that in September 1947, Rural Electric first installed utility poles along Jones Road. In September 1975, Rural Electric completed an improvement project by installing utility poles along Hays Road. As part of that project, Rural Electric moved the utility pole in question from a location along Jones Road to its current location near the southeast corner of the intersection of Hays and Jones Roads. No guidelines or specifications existed regarding the distance utility poles should be placed from intersections. However, when Rural Electric placed the utility pole at its current location, Rural Electric's "ruling span" guidelines suggested a distance of 326 feet between utility poles, allowing a divergence of 10%. Thus, utility poles could be placed between 294 feet and 358 feet apart and still fall within the guidelines. In 1978, Rural Electric adopted a specification that suggested a 300-foot ruling span for additional protection of the poles from ice storms. The distance between the utility pole in question and the next utility pole along Hays Road was 224 feet. DeLaby opined that it would cost approximately $1,000 to move the utility pole in question farther from the intersection.

DeLaby also testified that prior to the July 19, 1998, accident, Rural Electric did not know of any accidents that (1) involved the utility pole in question or (2) occurred at or near the intersection. He acknowledged that at the time of the accident, Rural Electric was aware that (1) no streetlights existed near the intersection of Hays

and Jones Roads; (2) east of the intersection, the surface of Hays Road changed; and (3) no posted speed limit signs existed on Hays Road, which meant that the speed limit was 55 miles per hour. DeLaby also acknowledged that Miller's exhibit Nos. 1 through 9 were photographs that accurately depicted Hays Road and its intersection with Jones Road as they existed in July 1998.

Miller testified that on the night of the accident, she turned onto Hays Road about one mile before its intersection with Jones Road. Although Miller had never driven on Hays Road before that night, she had driven on country roads for many years. Just prior to the accident, Miller was traveling between 45 and 50 miles per hour. She described the accident as follows:

> "[Hays Road] looked like it went straight ahead. I was under the impression that it went straight ahead, that's why I continued to drive straight ahead, until right when I came up on that, came up on that little, that rise, *** that's right then is when I realized it made a turn to the right.
>
> So of course the first, my first reaction was to turn to the right, and because of the rocks on the road I just kept going straight, and I hit the [utility] pole."

Had it not been for the loose gravel in the intersection, Miller "would have had control" of her minivan.

Following a January 2003 hearing on Rural Electric's motion to dismiss, the trial court took the matter under advisement and instructed the parties to submit additional written briefs, which the parties later did.

Later in January 2003, Rural Electric filed a supplemental section 2—619 motion to dismiss the remaining allegation set forth in count IV on the ground that Miller's claim was barred by the statute of repose (735 ILCS 5/13—214(b) (West 2002)). In February 2003, Miller filed a motion for leave to file an amended complaint. Count IV of the amended complaint alleged that Rural Electric acted negligently by keeping, maintaining, and continuing to use a utility pole that had been placed in a dangerous location. Later in February 2003, the trial court granted Rural Electric's motion to dismiss the remaining allegation set forth in count IV.

In March 2003, the trial court entered an order (1) denying Miller's motion for leave to file an amended complaint, upon determining that nothing in the amended complaint established that Rural Electric owed a duty to Miller, and (2) finding that no just reason existed for delaying enforcement or appeal of its September 1999 and February 2003 orders dismissing count IV (155 Ill. 2d R. 304(a)). Based on its ruling, the court did not address Rural Electric's statute of repose

argument. This appeal of the court's February 2003 order dismissing the remaining allegation set forth in count IV followed.

## II. ANALYSIS

### A. Section 2—619 Motions To Dismiss

■ Section 2—619 motions to dismiss provide a means for disposing of issues of law or easily proved issues of fact. *People v. Philip Morris, Inc.*, 198 Ill. 2d 87, 94, 759 N.E.2d 906, 911 (2001). In this case, the ground advanced for dismissing the remaining allegation set forth in count IV of Miller's complaint is that the claim asserted therein is barred because Rural Electric owed no duty to Miller. See *Lang v. Silva*, 306 Ill. App. 3d 960, 970, 715 N.E.2d 708, 715 (1999) (the lack of a duty is an appropriate basis for a section 2—619 motion to dismiss); see also 735 ILCS 5/2—619(a)(9) (West 2002) (permitting involuntary dismissal when "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim"). The trial court should grant the motion and dismiss the complaint if, after construing the allegations in the light most favorable to the plaintiff, no set of facts can be proved that would entitle the plaintiff to recover. We review *de novo* the trial court's granting of a defendant's section 2—619 motion. *Towne Realty, Inc. v. Shaffer*, 331 Ill. App. 3d 531, 535, 773 N.E.2d 47, 51 (2002)).

### B. Miller's Claim That Rural Electric Owed a Duty to Her

Miller argues that the trial court erred by granting Rural Electric's October 2002 motion to dismiss the remaining allegation of count IV because under the circumstances of this case, Rural Electric owed her a duty to place the utility pole a "reasonably safe" distance from the intersection of Hays and Jones Roads. We disagree.

■ The existence of a duty is essential to a claim sounding in negligence (*LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 388, 706 N.E.2d 441, 446 (1998)), and whether a duty exists is a question of law (*Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186, 766 N.E.2d 1118, 1123 (2002)). In determining whether a duty exists, a court should consider the following factors: (1) the reasonable foreseeability of injury; (2) the reasonable likelihood of injury; (3) the magnitude of the burden that guarding against injury places on the defendant; and (4) the consequences of placing that burden on the defendant. *Happel*, 199 Ill. 2d at 186-87, 766 N.E.2d at 1123-24.

■ In *Gouge v. Central Illinois Public Service Co.*, 144 Ill. 2d 535, 538-39, 582 N.E.2d 108, 110 (1991), the plaintiff lost control of his car as he approached a sharp right-hand curve, skidded 65 feet, left the paved roadway, crossed a gravel shoulder, and struck a utility pole

owned by the defendant utility company. The plaintiff sued the utility company for the injuries he sustained when he struck the utility pole, which was located 15 feet from the paved roadway. The trial court dismissed the plaintiff's complaint for failing to state a cause of action, and the appellate court reversed, upon concluding that the complaint stated a cause of action for "negligent installation" of the utility pole. *Gouge*, 144 Ill. 2d at 539, 582 N.E.2d at 110. The supreme court reversed, upon concluding that it was not reasonably foreseeable that the plaintiff would deviate from the roadway and strike the utility pole. *Gouge*, 144 Ill. 2d at 545, 582 N.E.2d at 113. In so concluding, the supreme court relied on section 368 of the Restatement (Second) of Torts, which provides as follows:

> "A possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who
>> (a) are traveling on the highway, or
>> (b) *foreseeably deviate from it in the ordinary course of travel.*"

(Emphasis added.) Restatement (Second) of Torts § 368 (1965) (hereinafter Restatement).

For a duty to arise under section 368, the person to whom the duty is owed must foreseeably deviate from the roadway in the ordinary course of travel, and the distinction " 'is thus not one between inadvertent and intentional deviations, but between those which are normal incidents of travel and those which are not.' " *Battisfore v. Moraites*, 186 Ill. App. 3d 180, 189, 541 N.E.2d 1376, 1382 (1989), quoting Restatement § 368, Comment *g*, at 270 (1965).

In addition, in *Boylan v. Martindale*, 103 Ill. App. 3d 335, 346, 431 N.E.2d 70-71 (1982), the Second District Appellate Court stated as follows:

> "It is common knowledge that vehicles collide in roadways and on occasion leave the roadway and strike a utility pole or tree adjacent to the roadway. However, for a duty to third persons to be imposed upon those who erect and maintain such utility poles, there must be a reasonable anticipation of such deviation from the roadway as a normal incident of travel."

### 1. *Reasonable Foreseeability*

Miller first contends that it was "reasonably foreseeable that a motorist traveling down Hay[ ]s [R]oad might deviate from the roadway in the ordinary course of travel and strike the utility pole." We disagree.

In support of a section 2—619 motion to dismiss, a defendant may file exhibits, including affidavits. A court will accept as true those evidentiary facts in a defendant's supporting affidavit if the plaintiff fails to refute those facts in a counteraffidavit, notwithstanding contrary, unsupported allegations in the plaintiff's complaint. *Pryweller v. Cohen*, 282 Ill. App. 3d 899, 907, 668 N.E.2d 1144, 1149 (1996). Here, count IV of Miller's complaint alleged that Rural Electric should have known that one or more motor vehicle accidents had occurred at the intersection of Hays and Jones Roads. However, DeLaby's affidavit refuted that unsupported allegation. In particular, DeLaby averred that (1) prior to Rural Electric's placing the utility pole in September 1975, Rural Electric did not know of any accidents in which vehicles left the roadway because of a failed right-hand turn onto Jones Road while traveling east on Hays Road; and (2) Rural Electric was not aware of any accident (other than Miller's) in which a vehicle left the roadway at the intersection and struck the utility pole. Thus, no evidence showed that when Rural Electric placed the utility pole in 1975, it was aware of any facts that would indicate a reasonable foreseeability that motorists would deviate from the roadway in the ordinary course of travel and strike the utility pole.

Miller nonetheless asserts that the depositions of Hays and Drake show that Rural Electric should have known that the intersection was dangerous. Contrary to that assertion, neither Hays nor Drake testified that she knew of any accidents (other than Miller's) involving the utility pole in question. Although Hays and Drake knew of (or had heard about) other accidents on Hays and Jones Roads near the intersection, neither one testified that those prior accidents involved situations similar to Miller's. For instance, Drake knew of accidents in which drivers had ended up in the Drakes' field on the northwest side of the intersection; however, she did not know whether those drivers lost control in the intersection or simply drove off the road into the field. Further, the accidents that Hays had heard about involved a fender bender, a car hitting a roadway mile marker, and drunk drivers sliding into ditches. See *Boylan*, 103 Ill. App. 3d at 346, 431 N.E.2d at 70 (in which the appellate court concluded, in part, that the plaintiff's complaint had failed to allege that (1) the particular utility pole previously had been struck by vehicles, or (2) the condition that caused vehicles to strike other nearby utility poles correlated with any similar condition at the location of the plaintiff's accident).

In addition, contrary to Miller's assertion, Drake did not request that the township install stop signs at the intersection "because of the dangerous nature of the intersection." Instead, Drake testified

that (1) she had requested that stop signs be installed because drivers go too fast as they approach the intersection; and (2) if drivers traveled at a "reasonable speed," the loose gravel at the intersection was not dangerous. In short, the depositions of Hays and Drake simply do not support Miller's claim that Rural Electric should have (1) known that the intersection was dangerous or (2) foreseen her accident.

Further, we reject Miller's suggestion that (1) her exhibit Nos. 1 through 9 (photographs depicting the roadway near and at the accident site at the time of the July 1998 accident) and (2) DeLaby's testimony regarding Rural Electric's knowledge of the road and lighting conditions in July 1998 indicate that Rural Electric had notice that the intersection constituted a dangerous condition. As Rural Electric points out, the photographs and testimony regarding the accident site conditions in July 1998 are irrelevant to determining whether Rural Electric knew that the intersection was dangerous in 1975, when it placed the utility pole in its current location. Notably, nothing in the record shows that the accident site conditions as they existed in July 1998 were the same as they were in 1975. To the extent that Miller attempts to claim that the photographs and related testimony show a recently developed condition that caused her accident, we note that her complaint did not allege that Rural Electric had a continuing duty to inspect the utility pole in relation to potentially changing road conditions.

Moreover, the undisputed fact that Miller's accident was the only reported accident involving the utility pole since its September 1975 placement weighs against Miller's claim that it was foreseeable that as a normal incident of travel, a motorist would deviate from the roadway and strike the utility pole. In that regard, we agree with the Maryland Court of Appeals in *Coates v. Southern Maryland Electric Cooperative, Inc.*, 354 Md. 499, 523, 731 A.2d 931, 944 (1999), which wrote as follows:

> "[A] collision with any particular pole is not legally foreseeable merely by virtue of its proximity to the traveled portion of a road. Such a collision may be foreseeable, however, based on the condition and topography of the road, the proximity of the pole to the traveled portion of the road, other site conditions, and experience. Absent significant changes to the road or the site, *experience may be the best guide*, for it tends to amalgamate many of the other factors. *If a pole has existed at a relatively unchanged site for any significant length of time without serious problem, there may be little reason to anticipate a future collision, for it suggests that motorists are able to navigate that part of the road without incident.*"
> (Emphasis omitted, and emphases added.)

Prior to Miller's accident, the utility pole stood at its location approximately 10 feet from the southeast corner of the intersection for almost 23 years without serious incident. Indeed, during that time, Rural Electric had not been notified of *any* accident involving the utility pole. Under such circumstances, Rural Electric had little reason to anticipate future accidents.

Under the circumstances of this case, we conclude that Miller's injury was not reasonably foreseeable—that is, it was not reasonably foreseeable to Rural Electric that Miller would deviate from the roadway as she did in the ordinary course of travel and strike Rural Electric's utility pole.

In so concluding, we note that Miller's contention that her accident was reasonably foreseeable constitutes an attempt to view the accident with the benefit of hindsight. As our supreme court stated in *Cunis v. Brennan*, 56 Ill. 2d 372, 376, 308 N.E.2d 617, 619 (1974):

> "In judging whether harm was legally foreseeable[,] we consider what was apparent to the defendant at the time of his now complained[-]of conduct, not what may appear through exercise of hindsight. We will not look back, as it was felicitously put by Justice Cardozo, 'at the mishap with the wisdom born of the event ***.' [*Greene v. Sibley, Lindsay & Curr Co.*, 257 N.Y. 190, 192, 177 N.E. 416, 417 (1931)]."

Miller cites the following factors as supporting her contention that the accident was reasonably foreseeable: (1) her unfamiliarity with Hays Road and its intersection with Jones Road; (2) the lack of lighting at the intersection; (3) the loose gravel at the intersection; (4) the 55-mile-per-hour speed limit; and (5) the fact that she panicked when she thought that she could only turn right onto Jones Road. We agree with Rural Electric that although these factors might explain how the accident occurred, they do not establish that the accident was reasonably foreseeable. Instead, Miller's argument constitutes an attempt to look back " 'at the mishap with the wisdom born of the event.' " *Cunis*, 56 Ill. 2d at 376, 308 N.E.2d at 619, quoting *Greene*, 257 N.Y. at 192, 177 N.E. at 417.

## 2. *Other Factors in the Duty Analysis*

■ Having concluded that Miller's injury was not reasonably foreseeable, we now turn to the remaining three factors in the duty analysis: (1) the likelihood of Miller's injury; (2) the magnitude of the burden Rural Electric would bear were we to place the duty on it; and (3) the consequences of placing the burden on Rural Electric.

Given that no vehicular accidents were reported involving the utility pole between its September 1975 placement and Miller's July 1998 accident, we conclude that the likelihood of injury was slight.

We further conclude that although the cost of relocating the utility pole 10 to 35 feet farther from the intersection (a distance Miller suggests would make it safe for motorists) may be relatively small, the economic costs of requiring Rural Electric to independently survey all of its utility poles and determine whether any of them have been placed in dangerous locations based on particular road conditions, lighting conditions, speed limits, signage, and other relevant conditions would be staggering. As Rural Electric correctly points out, it is not in control of (1) how a roadway is constructed or surfaced, (2) whether or how a township decides to post signs on a roadway, or (3) the speed limit. Yet, any of those factors could change after Rural Electric had installed a utility pole and without notice to Rural Electric. Thus, were we to impose a duty on Rural Electric, it would be required to (1) continuously monitor changes in road and other relevant conditions to determine whether a particular utility pole had been placed in a dangerous location, and (2) perhaps move hundreds of utility poles, at enormous cost and inconvenience to both Rural Electric and its customers, and, even then, without an absolute assurance of safety.

In light of the foregoing considerations, we conclude that Rural Electric did not owe a duty to Miller. We thus hold that the trial court did not err by granting Rural Electric's October 2002 motion to dismiss the remaining allegation set forth in count IV.

In so holding, we reject Miller's suggestion that this court has created "something very close to" immunity for utility companies "with respect to the placement of their utility poles." In *Gouge*, 144 Ill. 2d at 546-47, 582 N.E.2d at 114, the supreme court addressed the same argument and stated, in pertinent part, as follows:

> "We also disagree with plaintiffs' contention that utility companies are being granted 'virtual immunity in the installation of its electrical energized power poles and transformers along the roadways of the State of Illinois.' Utility companies do have a duty to exercise reasonable care in the installation and maintenance of their utility poles. CIPS [(Central Illinois Public Service Company)] owed a duty to properly guy its utility poles so that, for instance, they would not fall onto a roadway, smashing an automobile and injuring the driver. This duty is not being diminished. Nonetheless, CIPS does not owe a duty to motorists who unforeseeably deviate from the traveled portion of the roadway and strike a utility pole located 15 feet from the roadway. As stated in *Dunn v. Baltimore & Ohio R.R. Co.*[, 127 Ill. 2d 350, 366, 537 N.E.2d 738, 745 (1989)]:
>
> > 'The law imposes a duty on all persons to exercise ordinary care. We believe that the imposition of a general duty to

anticipate and guard against the negligence of others would place an intolerable burden on society.' "

Similarly, in this case, Rural Electric has a duty to exercise reasonable care in installing and maintaining its utility poles. However, Rural Electric does not owe a duty to motorists who unforeseeably deviate from the traveled portion of the roadway and strike a utility pole that is set back 10 feet from the roadway.

### C. Miller's Claim That a Duty Arises Because Rural Electric Failed To Follow Its Own Guideline

■ Although not set forth as a separate argument, Miller contends that a duty arises because Rural Electric violated its own ruling span guideline when it placed the utility pole in 1975. We disagree.

To impose liability for a defendant's violation of a statute or rule designed to protect human life or property, a plaintiff must show the following: (1) the violation proximately caused the injury; (2) the plaintiff belonged to the class of persons whom the rule was intended to protect from injury; and (3) the kind of injury suffered by the plaintiff was the kind of injury the rule sought to prevent. *Gouge*, 144 Ill. 2d at 543, 582 N.E.2d at 112.

In this case, DeLaby testified that under Rural Electric's 1975 ruling span guidelines, utility poles could be placed between 294 feet and 358 feet apart. The distance between the utility pole in question and the next utility pole along Hays Road was 224 feet. Miller asserts that if Rural Electric had followed its own guidelines, it would have placed the utility pole in question 111 feet farther away from the intersection. Even accepting Miller's contention that Rural Electric violated its own guidelines in placing the utility pole, we conclude that Miller has not shown that the ruling span guidelines were intended to protect against the type of injury that occurred in this case. Indeed, nothing in the record indicates that the ruling span guidelines were designed to regulate Rural Electric in its placement of utility poles in light of safety concerns for passing motorists. Instead, DeLaby's testimony suggested that the purpose of those guidelines was to assure the stability of the utility poles and prevent them from falling over due to the strain of ice accumulation. Notably, DeLaby testified that no guidelines or specifications existed regarding the distance utility poles should be placed from intersections. Accordingly, we reject Miller's contention that Rural Electric owed her a duty to install the utility pole in accordance with its ruling span guidelines.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON, J., concurs.

JUSTICE COOK, specially concurring:

A section 2—619 motion is generally not an appropriate vehicle for determining whether a plaintiff has stated a good cause of action in negligence. A section 2—619 motion admits the legal sufficiency of plaintiff's complaint and goes on to suggest that the claim asserted is barred by other affirmative matter such as release, satisfaction of judgment, discharge in bankruptcy, or the running of the statute of limitations. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115, 619 N.E.2d 732, 735 (1993). Defendant may not prevail on a section 2—619 motion without establishing some affirmative matter that defeats the claim; simply negating the allegations of the plaintiff's complaint is not sufficient. *Kedzie*, 156 Ill. 2d at 115, 619 N.E.2d at 735. Nevertheless, the trial court in this case did not rule on the motion until discovery had been completed. The motion here is properly viewed as a motion for summary judgment. 735 ILCS 5/2—1005 (West 2002).

As the majority points out, the existence of a duty is a question of law for the court. Issues of breach of duty, however, are questions of fact for the jury. It is possible to view questions of duty broadly (everyone owes everyone else the duty to act reasonably under the circumstances) and to allow most cases to be decided by the jury. Viewed broadly, there is a duty in this case. "Utility companies do have a duty to exercise reasonable care in the installation and maintenance of their utility poles." *Gouge*, 144 Ill. 2d at 546, 582 N.E.2d at 114. Taking such a broad approach, however, amounts to an abandonment of the court's role in determining the important policy questions justifying the imposition of a duty. See *Benner v. Bell*, 236 Ill. App. 3d 761, 765, 602 N.E.2d 896, 899 (1992).

Parties do have some obligation to anticipate the negligence of others. In a case alleging the negligent installation and maintenance of a guardrail, for example, it was held that the fact that the county erected the guardrail, at the location in question, conceded the foreseeability that motorists would deviate from the ordinary course of travel in the direction of the guardrail. *Michalak v. La Salle County*, 121 Ill. App. 3d 574, 576, 459 N.E.2d 1131, 1132 (1984). The mere fact that vehicle collision with utility poles is foreseeable, however, does not

justify the imposition of a broad duty on the utility to prevent such collisions. The more important questions in this case are the magnitude of the burden placed on defendant and the consequences of imposing that burden, questions within the exclusive discretion of the courts. The transmission of electricity by use of utility poles is a matter of considerable benefit to the public. *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 312-13, 45 N.E.2d 665, 673 (1942); *Tinder v. Illinois Power Co.*, 325 Ill. App. 3d 606, 610, 758 N.E.2d 483, 487 (2001). For a duty to exist under the facts of this case, plaintiff must identify some particular defect in the construction, placement, or maintenance of the pole in question. It is not enough to show that it is likely that vehicles will randomly deviate from the highway and strike utility poles; some specific problem must be shown with this particular pole.

Finally, I disagree with the majority's assertions (344 Ill. App. 3d at 1167) that any negligence of Rural Electric must be based on its conduct in 1975, when it placed the utility pole in its current location. Rural Electric had a duty to reasonably maintain the pole. If Rural Electric later became aware of facts indicating improper placement of the pole, it may have had a duty to move the pole. The majority seems to abandon that argument elsewhere. 344 Ill. App. 3d at 1168 (fact that this accident was the only accident since 1975 "weighs against Miller's claim that it was foreseeable"); *Coates*, 354 Md. at 523, 731 A.2d at 944 ("experience may be the best guide").